HUMPHREY and others, Executors, Appellants, vs. PLUMER and others, Respondents.

*September 7.— September 29, 1891.*

*Fraud: Evidence: Tax titles: Settlement of litigation.*

In an action to set aside a quitclaim deed and the transfer of tax certificates and the tax deeds issued thereon, on the ground that they had been procured by false and fraudulent representations made by defendants in negotiations for the settlement of certain litigation, findings of the trial court to the effect that there was no fraud or misrepresentation are *held* to be sustained by a preponderance of the evidence.

APPEAL from the Circuit Court for *Wood* County.

This is an action commenced by John Comstock in his life-time and *Frank B. Clark* to set aside a quitclaim deed from the said Comstock and *Clark* to *D. L. Plumer,* executed and delivered March 25, 1884, on the ground that the same was procured by the false representations and fraud of the defendants *Silverthorn* and *Hurley,* upon eighty acres of land described; and also the transfer of certain tax certificates for the years 1880 and 1881, from Comstock and *Clark,* whereby and upon which tax deeds were taken, to the defendant *Moore;* and also to set aside such tax deeds.

The complaint alleges, in effect, that Comstock and *Clark* acquired title to said eighty acres of land by virtue of a tax deed thereon upon the sale of 1877, issued to John Comstock, and recorded May 26, 1880; also another tax deed thereon on the sale of 1878, issued to John Comstock, and recorded June 14, 1881; also another tax deed thereon upon the sale of 1879, issued to John Comstock, and recorded May 31, 1882. That Comstock and *Clark* also were, on March 25, 1884, the owners and holders of tax certificates on the sale of lands for 1880 and 1881. That, March 25, 1884, the said *Clark* acquired an interest in said eighty by a conveyance from said Comstock. That said eighty was wild and unoccupied at that time, and the original owners' right to the same had become barred by the statute of limitation. That one Thomas B. Guy had previously procured a patent to said eighty, February 20, 1875. That, March 25, 1884, said Comstock held and claimed title by virtue of tax deeds to a large quantity of lands, and a large quantity of tax certificates on lands then situated in Lincoln county. That a large number of suits had previously been commenced against Comstock and *Clark,* or one of them, to set aside and cancel said tax deeds and tax certificates, in some of which *Silverthorn* and *Hurley* were attorneys for the plaintiffs therein, and that they claimed

they were attorneys for other parties to commence suits for the same purpose. That they were also attorneys for Van R. Willard in a suit then pending in behalf of himself and other tax-payers of said county affecting the title to all the lands so held under tax deeds by the said Comstock and *Clark*, and involving many thousands of dollars. That a short time prior to March 25, 1884, *Silverthorn* and *Hurley* proposed a settlement with Comstock and *Clark* of all said matters in which they were attorneys for the original owners, and to use their influence with the county board of Lincoln county to settle said Willard suit, and not to engage in any further litigation with Comstock and *Clark* affecting their title to any of said lands. That they procured said deed to *Plumer* by falsely and fraudulently representing that they represented the "Gray heirs," who were original owners of said eighty, and that no settlement should or would be made unless that eighty acres were included, and that *Plumer* would subsequently convey to the rightful original owners. That Comstock and *Clark*, believing such representations, made said quitclaim deed accordingly, and transferred said tax certificates accordingly. That May 26, 1884, a tax deed was procured from said county by said *Moore* on said tax certificates, and recorded on that day, as stated. That subsequently *Silverthorn*, *Hurley, Plumer,* and *Moore* executed a quitclaim deed of said eighty to the defendant the *Northern Chief Iron Company*, a corporation in which they were the principal parties.

The answer consists of admissions and denials, and allegations to the effect that such settlement and said deed and transfers were made without any false representations, and *bona fide*, and upon a good consideration.

It appeared upon the trial that, February 8, 1883, Thomas B. Guy, mentioned in the complaint, and an unmarried man, gave a quitclaim deed to Raymond and Haseltine of an un-

divided one-half interest in said eighty; that, May 12, 1886, Comstock, Thomas B. Guy, Raymond, and Haseltine entered into an agreement in writing for the prosecution of this action, wherein it was mutually agreed that, upon the title to said eighty being perfected and vested in said parties, or either of them, the lands should be equally divided by proper conveyances, so that an undivided one-third thereof should be vested in Comstock, another undivided one-third thereof should be vested in Raymond and Haseltine, and the other one-third thereof should be vested in said Guy; that June 26, 1886, this action was begun.

At the close of the trial the court found as matters of fact, in effect, that said quitclaim deed to *Plumer* upon the lands in question, and the tax certificates thereon for the years 1880 and 1881, were purchased and obtained for a valuable consideration, and without fraud or misrepresentation upon the part of the defendants or any of them; that the defendants *Silverthorn* and *Hurley* did not, nor did either of them, state to Comstock and *Clark*, at or before the time of the execution of said deed to *Plumer* or the delivery of said tax certificates, or at any other time, that the said "Gray heirs" were the original owners of the lands described in the complaint, or held the government title thereon, or that they, the said *Silverthorn* and *Hurley*, represented the said "Gray heirs," or were instructed by said "Gray heirs" to recover said lands from the plaintiffs. And as conclusions of law the court decided that this action should be dismissed, and that judgment should be rendered against the plaintiffs and in favor of the defendants for costs; and judgment was ordered accordingly. From the judgment so entered thereon the plaintiffs appeal.

For the appellants there were briefs by *W. F. Bailey*, attorney, and *E. S. Bragg*, of counsel, and oral argument by *Mr. Bragg*.

For the respondents there was a brief by *T. C. Ryan*, and oral argument by *Mr. Ryan* and *Mr. S. U. Pinney*.

CASSODAY, J.  We are asked to reverse the judgment on the sole ground that the findings of fact are against the clear preponderance of the evidence.  The testimony is voluminous.  We have read it all.  We have also carefully considered the brief and able argument of counsel for the plaintiffs.  It is only permissible here to state our views of the case in a general way.

The suit of *Willard v. Comstock*, 58 Wis. 565, was commenced in the name of Willard and ten other tax-payers of Lincoln county, as well in their own behalf as in that of other tax-payers in the county, similarly interested. *Silverthorn & Hurley* appear to have been employed to commence the same by *Plumer*, Quaw, Vaughn, and *Moore*, personally, and they afterwards left the whole management of that suit to *Plumer*, who, in such management, represented them and other parties; and *Plumer* advanced the moneys in the prosecution of that suit.  Prior to the commencement of that suit — August 11, 1882 — *Silverthorn & Hurley* had commenced five ejectment suits for different parties against Comstock, and they commenced four ejectment suits thereafter.  There were many other cases pending in relation to those tax titles, in which other attorneys were engaged.  Comstock testified, in effect, that the *Willard Case* involved, perhaps, 100,000 acres of land, and the complaint in this action, verified by Comstock, alleges that the Willard suit affected "the title to *all the lands* so held under *tax deeds* by these plaintiffs, as aforesaid, and involving many thousands of dollars."  Since he had obtained each of his three tax deeds on the eighty acres in question prior to the commencement of that suit, it is obvious that that eighty was thus involved in that suit.  The object of that suit was to set aside the transfer to Comstock by the county of something like $75,000 worth of tax certificates obtained by him for the trifling sum of twenty-five per cent. of their face value, and which certificates were alleged

to have been obtained by Comstock through fraudulent collusion with the county officers and the members of the county board, and also to set aside tax deeds obtained by him on such certificates. *Willard v. Comstock*, 58 Wis. 565. That case was decided by this court, November 20, 1883. Three of the ejectment suits mentioned were decided by this court, February 19, 1884. *Plumer v. Clark*, 59 Wis. 646.

It appears from testimony on the part of the plaintiffs, to the effect that, in March, 1884, Wilson, one of their attorneys at St. Paul, came to Merrill to aid the local attorneys in preparing for the trial of the *Willard Case* in the following April; that the attorneys for the plaintiffs in that suit proposed a settlement, so far as the interests they represented were concerned; that it was getting close to the trial of the Willard suit, and, if there was going to be a settlement, they desired to know it at once; that the result was an interview at Wausau between them and *Plumer*, *Silverthorn*, and *Hurley;* that in that interview they were informed generally what the latter might be willing to do; that Wilson was satisfied with their proposition, except as to the amount of money to be paid; that Wilson then wrote or telegraphed Comstock to have the syndicate meet at St. Paul; that they all met accordingly, March 25, 1884, and made the settlement as they claimed it was made; that upon that settlement *Silverthorn* and *Hurley* gave their draft on the First National Bank of Wausau, payable to Wilson or order, for $756.16. Neither Wilson nor *Plumer* was sworn. *Silverthorn* and *Hurley* each testify, in effect, that in the interview at Wausau, Friday, March 21, 1884, *Plumer* made out a list of the lands covered by tax titles, which he and they insisted were to be conveyed to him in case of settlement, and that, upon being copied by them, the same was delivered to Wilson, and included the lands in question, and that the same list so made out by *Plumer* was present

and in the possession of Wilson at the time of the settlement at St. Paul. They each admit that the land in question was spoken of there as belonging to the "Gray heirs;" but they, in effect, each deny that they represented that the "Gray heirs" were minors, or that they represented them, or that they were the original owners, or that they made any misrepresentations whatever. They further state, in effect, that that term, "Gray heirs," was so used simply because *Plumer* had so used it; and that when it was so used there was no inquiry as to who such heirs were, or where they were, or their ages. Comstock admits, in effect, that Wilson was the business man of the concern; that he might have had a list of the lands at the time of the settlement there at St. Paul, and that he had the paper in his hand; that the identical descriptions of the lands brought to St. Paul by *Silverthorn* and *Hurley* were put into the deed to *Plumer;* that he presumed that Wilson had them before they came to St. Paul; that the terms of the settlement were arrived at very quickly; that they did not have to ·go over any details or negotiations, particularly, for any length of time; that their counsel had a description of their lands, and were familiar with the matter, and looked after the title and the controversy; that he had a list of the lands at St. Paul, independent of any list brought there by *Silverthorn* and *Hurley;* that when they took tax deeds upon lands they did the best they could, as a rule, to know who the original owners were; that he guessed they went to the land office to see who made the entry; that they supposed they were iron lands; that they were called such in that region. The list of lands made out by *Plumer*, as stated, is in evidence, and the particular eighty in question is headed: "Gray heirs (*not in suit*)." It is understood by this that that eighty was not involved in any *ejectment* suit. From a certified copy of records in the land office it would appear that the eighty was entered and patented

in the name of " Thomas B. Gray" or " Grey," instead of " Thomas B. Guy," who is conceded to have been the original owner. At the time of the settlement the eighty does not seem to have been regarded of any special value by Comstock or Wilson or any of those represented by them; but it is said that it has since been ascertained to be of very great value. The prime motive which seems to have induced Comstock and Wilson and those represented by them to make the settlement was to procure, as far as possible, the abatement of the Willard suit, then about to be forced to trial, by making a full and satisfactory settlement with all who had been instrumental in the prosecution of that case. It appears that Comstock subsequently settled with the county, and paid it some $40,000 for such certificates in addition to what he had previously paid.

Such being our general view of the case, we are unable to say that the findings of the trial court are against the weight of evidence. On the contrary we think they are fairly supported by the preponderance of the evidence. This makes it unnecessary to consider the question of law argued by counsel for the defendants to the effect that in no event would the plaintiffs be entitled to a partial rescission of the settlement.

*By the Court.*— The judgment of the circuit court is affirmed.